UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| ASHENAFI GERRE ABERHA,<br><br>                        Petitioner,<br>v.<br><br>BRIAN WILLIAMS[1], et al.,<br><br>                        Respondents. | Case No. 3:20-cv-00524-LRH-CSD<br><br>**ORDER** |

      Petitioner Ashenafi Gerre Aberha, a Nevada prisoner, filed an Amended Petition for Writ of Habeas Corpus (ECF No. 19) ("Petition") under 28 U.S.C. § 2254. This matter is before the Court for adjudication of the merits of the grounds in the Petition. For the reasons discussed below, the Court denies the Petition and a Certificate of Appealability.[2]

### I.    BACKGROUND[3]

      In the Petition, Aberha challenges a conviction and sentence imposed by the Eighth Judicial District Court for Clark County, Nevada ("state court") pursuant to a jury verdict finding him guilty of burglary under NRS 205.060 and sexual assault under 200.366. (ECF Nos. 19, 20-4.) The

---

[1] According to the Nevada Department of Corrections website, Brian Williams is the current warden of High Desert State Prison, where Aberha is currently housed. *See* https://doc.nv.gov/Facilities/HDSP_Faciltiy/ (retrieved December 2022). At the end of this order, the Court directs the Clerk of the Court to substitute Brian Williams as Respondent for the prior Respondent Brian Williams, pursuant to, *inter alia*, Rule 25(d) of the Federal Rules of Civil Procedure.

[2] In the Petition, Aberha also requests an evidentiary hearing to offer proof concerning the allegations in the petition. (ECF No. 19 at 32.) Aberha does not make any argument as to why the Court should hold an evidentiary hearing, and the Court denies the request.

[3] The Court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state court. The Court summarizes the factual assertions solely as background to the issues presented in the case, and it does not summarize all such material. No statement of fact made in describing statements, testimony, or other evidence in the state court constitutes a finding by the Court. Any absence of mention of a specific piece of evidence or category of evidence does not signify that the Court has overlooked the evidence in considering Aberha's claim.

state court entered a judgment of conviction in April 2017. (ECF No. 20-4.) The state court sentenced Aberha to 48-120 months on the burglary conviction and to life with the possibility of parole after 10 years on the sexual assault conviction. (*Id.* at 3.) The state court also ordered a special sentence of lifetime supervision and that Aberha register as a sex offender within 48 hours of any release from custody. (*Id.*)

The charges against Aberha stemmed from a sexual encounter between Aberha, who worked for the Vdara Hotel and Spa, and Sophie Bolderson, who was a guest at the Vdara. (ECF No. 20-2.) An initial trial was held in May 2016. (ECF No. 24-45 at 1.) The jury was unable to reach a unanimous verdict, and the state court declared a mistrial. (ECF No. 25-1 at 14.) On May 25, 2016, the state court set February 13, 2017, as the date for a second trial. (ECF No. 25-3 at 7-8.)

On January 18, 2017, the state filed a motion to continue the trial, or, in the alternative, admit the JAVS recorded testimony of Sophie and Faye Bolderson from the first trial.[4] (ECF No. 25-15 at 4-5.) During a hearing on the motion, the prosecutor told the Court that after the second trial date was set, she had emailed Sophie with the date. (ECF No. 25-21 at 4.) Sophie did not reply to the initial email, and, after a couple of weeks, the prosecutor emailed her again. (*Id.*) This time Sophie responded that she had received the email and did not want any further delays. (*Id.*) Sophie also communicated the trial date to her sister Faye. (*Id.*)

Following a status check leading up the second trial, the prosecutor emailed Sophie to say that everything was set for trial. (*Id.* at 4-5.) Sophie then emailed back to say that she was starting a new job the week of the trial, that her sister had travel plans, and that they were not available for the trial date. (*Id.* at 5.) The prosecutor issued a subpoena to Sophie, and the out-of-state subpoena department in the prosecutor's office communicated with Sophie, but Sophie again stated that she was not available. (*Id* at 6.) The state court decided that it would either continue the trial or allow the prosecution to present the recorded testimony from Faye and Sophie. (*Id.* at 9.) Given the choice between those two options, Aberha's attorney stated that he would prefer to continue with

---

[4] The Court will refer to Sophie and Faye Bolderson by their first names to avoid confusion.

the current trial date, understanding that the state court would admit the recorded testimony over his objection. (*Id.* at 12-13.) The second trial was held as scheduled, and the prosecution introduced the recorded testimony of Fay and Sophie from the first trial. (ECF Nos. 25-25 at 1; 25-27 at 137-38.) The jury found Aberha guilty on both counts. (ECF No. 25-32 at 30.)

During the first trial, Faye testified that she, her sister Sophie, and a friend named Jess had traveled to Las Vegas from England in June 2013. (ECF No. 24-47 at 99.) Faye, Sophie, and Jess were sharing a room at the Vdara. (*Id.* at 101.) They arrived at around 2:00 or 3:00 in the afternoon, and, after checking in, went to the pool where they had cocktails. (*Id.* at 101-102.) At some point, they left the hotel to get dinner, and they returned around 9:00 p.m. (*Id.* at 106-07.)

Faye further testified that she and Jess wanted to go out again, but that Sophie wanted to sleep. (*Id.* at 107-08.) The room had a double bed, which Sophie and Faye intended to share, and a pullout sofa bed for Jess. (*Id.* 104-05.) They asked someone to make up the sofa bed and left Sophie to sleep in the room. (*Id.* at 107-08.) When they left, Sophie was already in bed sleeping, but the pullout bed had not yet been made up. (*Id.* at 108.) On the way out of the hotel, Faye and Jess saw a man in a housekeeping uniform and asked him to put some blankets inside their room. (*Id.* at 109-11.) Faye let him know that there was someone sleeping inside and that he should just leave the blankets inside the room. (*Id.* at 111.)

During the second trial, a hotel employee testified that Aberha, whom she supervised, contacted her to say that a guest staying in the Boldersons' room had asked for a blanket. (ECF No. 25-19 at 47-52.) The employee told Aberha that he could go ahead and deliver the blanket. (*Id.* at 53.) Aberha delivered the blanked and then told his supervisor that he was done cleaning two other rooms and would take his lunch break. (*Id.* at 53-55.) But the employee determined that Aberha had not finished cleaning the other rooms and told him to finish cleaning the rooms first. (*Id.* at 54-55.) Based on testimony from Jonathan Rodarte-Martinez, which the Court will discuss in more detail below, after cleaning the other rooms, Aberha returned to Sophie's room.

During the first trial Sophie testified that after eating dinner they returned to the hotel because she was extremely tired, having been up for about 24 hours, including her flight from London. (ECF No. 24-48 at 18.) After drinking during the day, and having just eaten dinner, she

3

was ready for bed. (*Id.* at 18-19.) When they returned to the room, she put on her nightgown and lay down in the bed. (*Id.* at 19.)

Sophie further testified that she was awoken from her sleep by a weight on top of her. (*Id.* at 23.) She realized that it was a man on top of her and that her nightgown had been pull up to her chest. (*Id.* at 23-24.) She testified that the man on top of her was having sex with her, and that she had never previously seen the man or consented to have sex with him. (*Id.* at 24.) When she woke up, the person on top of her got up and left the room without saying anything. (*Id.* at 26-27.) Shortly thereafter, another man came to the bed to ask whether she was alright. (*Id.* at 29.) The second man then left, and Sophie got up to get dressed. (*Id.* at 30-31.) While getting dressed, Sophie realized that there was semen in her genital area. (*Id.* at 31.)

Sophie testified that she then went to hotel reception and was eventually taken to the hospital for an examination (*Id.* at 32-33.) Following the examination, she spoke to detectives about the incident. (*Id.* at 34.) During the second trial, a sexual assault nurse examiner testified that she had examined Sophie. (ECF No. 25-29 at 185.) The nurse testified that she did not take note of any injuries to Sophie, but that that would not be unusual based on Sophie's version of events. (*Id.* at 198-99.)

During the second trial Jonathan Rodarte-Martinez[5] testified that he worked for the Vdara as a runner: taking supplies up to customers, making up sofa beds, and the like. (ECF No. 25-29 at 68.) He was sent to Sophie's room to set up a sofa bed. (*Id.* at 75.) When he arrived, he knocked and announced himself, but he got no response, so he knocked and announced himself again. (*Id.* at 75-76.) Not having received a response, he entered the room and found the lights off. (*Id.* at 77.) When he turned the lights on, Rodarte noticed some blankets had been put near the entrance to the room. (*Id.*) Rodarte then noticed Sophie[6] sleeping in the bed and announced himself, but Sophie did not respond. (*Id.* at 79-80.) Rodarte initially left the room, but then decided to go back and set up the sofa bed. (*Id.* at 80-81.)

---

[5] Jonathan Rodarte-Martinez introduced himself as Jonathan Rodarte, and the Court will use the name Rodarte to refer to him in this order.
[6] Rodarte did not know Sophie's name, and referred to her only as a woman in the room. For simplicity, the Court will refer to her as Sophie.

Rodarte further testified that when he returned to the room, he poked Sophie to let her know that he was going to set up the sofa bed. (*Id.* at 83.) Sophie woke up, said that was fine, and went back to sleep. (*Id.* at 83-84.) Rodarte went to set up the sofa bed, and while he was setting up the sofa bed, he heard the room's doorbell. (*Id.* at 85-86.) He went to the door, where he saw Aberha. (*Id.* at 88-89.) Aberha asked Rodarte whether the woman was still sleeping, and Rodarte responded that she was, and Aberha stated that he was going to wake her up. (*Id.* at 89-90.) Aberha did not indicate that he had plans with Sophie or address her by name. (*Id.* at 92.) Aberha climbed into bed with Sophie and started whispering to her, but Sophie was still asleep. (*Id.* at 95.)

Rodarte testified that Aberha started having sexual intercourse with Sophie. (*Id.* at 99.) Rodarte heard Sophie say, "oh baby," and thought that she seemed to be enjoying the sexual intercourse. (*Id.* at 99-100.) A "matter of seconds" later, Sophie sat up on the bed and started freaking out. (*Id.* at 100-01.) She asked what Rodarte was doing in her room, and she seemed really upset and shocked. (*Id.* at 101-102.) Aberha then pulled his pants up and left without any explanation or attempt to calm Sophie down. (*Id.* at 102-03.)

During the second trial, Detective Jessica Flink testified that when she questioned Rodarte following the incident, he stated that Sophie was conscious and that she was "going with it." (ECF No. 25-30 at 69.) In response to a question, Flink agreed that Rodarte had told her that when Sophie saw him, she said "whoa, whoa, whoa, what is he doing here." (*Id*. at 71.)

## II.   PROCEDURAL HISTORY

Aberha, represented by the Clark County Public Defender's Office, appealed his judgment of conviction. (ECF No. 16-10.) The Nevada Supreme Court affirmed the convictions. (ECF No. ECF No. 26-15.) Aberha then filed a *pro se* state court petition for a writ of habeas corpus. (ECF No. 26-18.) The state court denied Aberha's petition for a writ of habeas corpus, as well as his motions requesting appointment of counsel and an evidentiary hearing. (ECF No. 26-24.) Aberha appealed to the Nevada Supreme Court, which affirmed the denial of Aberha's state court petition for a writ of habeas corpus. (ECF No. 26-37.)

On September 16, 2020, Aberha filed a *pro se* § 2254 petition, an application to proceed in forma pauperis, and a request for the appointment of counsel with this Court. (ECF Nos. 1, 1-1,

1-2.) The Court denied Aberha's motion for appointment of counsel, and Aberha filed a renewed motion, which the Court granted. (ECF Nos. 11, 13.) Aberha, represented by the Federal Public Defender's Office, then filed the Petition. (ECF No. 19.) The Respondents answered the Petition, and Aberha filed a reply. (ECF Nos. 23, 33.)

### III. LEGAL STANDARD

#### a. Review under the Antiterrorism and Effective Death Penalty Act

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (first quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and then citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75.

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

IV. **DISCUSSION**

A. **Ground 1**

In Ground 1, Aberha claims that he was denied his right to confrontation, due process, and a fair trial when the state court admitted videorecorded testimony of Sophie and Faye Bolderson, violating his rights under the Fifth, Sixth, and Fourteenth Amendments. (ECF No. 19 at 19.)

1. **Relevant law**

The Sixth Amendment guarantees a defendant the right to confront witnesses: "In all criminal prosecutions the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. Amend. VI. There has traditionally been an exception to the confrontation requirement where a witness is unavailable and has given testimony at previous judicial proceedings against the same defendant which was subject to cross-examination by that defendant. *Barber v. Page*, 390 U.S. 719, 722 (1968). "This exception has been explained as arising from necessity and has been justified on the ground that the right of cross-examination initially afforded provides substantial compliance with the purposes behind the confrontation requirement." *Id.* However, "a witness is not 'unavailable' for purposes of the foregoing exception to the confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial." *Id.* at 724-25.

2. **State court determination**

In denying Aberha's direct appeal, the Nevada Supreme Court wrote:

> [W]hether a defendant's Confrontation Clause rights were violated is a question of law that is reviewed de novo. *Chavez v. State*, 125 Nev. 328, 339, 213 P.3d 476, 484 (2009). This court reviews whether "the prosecution exercised constitutionally reasonable diligence to procure a witness's attendance" as "a mixed question of law and fact." *Hernandez v. State*, 124 Nev. 639, 647, 188 P.3d 1126, 1132 (2008), *abrogated on other grounds by State v. Eighth Judicial Dist. Court*, 134 Nev., Adv. Op. 13, 412 P.3d 18, 22 (2018). As such, this court "will give deference to the district court's findings of fact but will independently review whether those facts satisfy the legal standard of reasonable diligence." *Id.* . . .
>
> NRS 51.055(1)(d) provides that a witness is "unavailable" if the witness is

> [a]bsent from the hearing and beyond the jurisdiction of the court to compel appearance and the proponent of the declarant's statement has exercised reasonable diligence but has been unable to procure the declarant's attendance or to take the declarant's deposition.

This court has interpreted the State's burden to "exercise[] reasonable diligence to mean that the State must make reasonable efforts to procure a witness's attendance at trial before that witness may be declared unavailable." *Hernandez*, 124 Nev. at 645, 188 P.3d at 1130-31 (alteration in original). In assessing the reasonableness of the prosecution's actions in procuring a witness, "[t]he law does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists ... 'good faith' demands nothing of the prosecution." *Id.* at 650-51, 188 P.3d at 1134-35 (quoting *Ohio v. Roberts*, 448 U.S. 56, 74 (1980)). "What constitutes reasonable efforts to procure a witness's attendance must be determined upon considering the totality of the circumstances." *Id.* at 650, 188 P.3d at 1134.

When the State learned that Sophie and Faye were unable to attend the second trial, it filed a motion to continue trial, or in the alternative, to admit transcripts from the first trial. The district court conducted a hearing on the matter, and the State explained the steps it took to procure Sophie and Faye's attendance. First, immediately after the trial was scheduled, the State emailed Sophie to notify her of the date. The State noted that it always communicated with Sophie via email because she resided in England and the state phone lines do not allow for international phone calls. When the State received no response, it emailed Sophie again a few weeks later asking, "did you get my last email telling you the date of the new trial?" Sophie responded the next day with, "Yes, I did receive your email. I don't want any further delays in this because of how the work system works in England." The State also represented to the district court that Sophie communicated the trial date to Faye.

Shortly before trial, the State again emailed Sophie to inform her that trial was set to begin on February 13, 2017, and that the defense was ready to move forward. Sophie then responded that she was starting a new job in England the week of trial and her sister had other travel plans, and therefore both were unavailable. The State then issued a subpoena to Sophie and filed a motion to continue.

We conclude that the State's actions, coupled with the fact that Sophie and Faye are British and therefore outside the subpoena power of the district court, equate to reasonable diligence. *See, e.g., Mancusi v. Stubbs*, 408 U.S. 204, 212 (1972) (holding good faith effort was satisfied where witness moved to Sweden and could not be compelled to return to the United States); *Quillen v. State*, 112 Nev. 1369, 1376, 929 P.2d 893, 897 (1996) (finding the State's efforts reasonable when it made an effort to contact the witnesses, and it was "revealed that the witnesses quit their jobs, moved out of their home some five months prior to trial, [ ] left no forwarding address ... [and potentially] returned to Mexico"). Under the totality of the circumstances, the district court properly found Sophie and Faye unavailable. . . .

The Sixth Amendment Confrontation Clause guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him." U.S. Const. amend. VI. "In accordance with that right, prior testimony from a witness unavailable at trial is admissible only if the defendant had 'a prior opportunity for cross-examination.'" *State v. Eighth Judicial Dist. Court*, 134 Nev., Adv. Op. 13, 412 P.3d 18, 21 (2018) (quoting *Crawford v. Washington*, 541 U.S. 36, 68 (2004)). "The adequacy of the opportunity to confront will be decided on a case-by-case basis, turning upon the discovery available to the defendant at the time and the manner in which the [] judge allows the cross-examination to proceed." *Chavez v. State*, 125 Nev. 328, 337, 213 P.3d 476, 482 (2009). Aberha does not argue that the district court denied him adequate discovery during the first trial, or that he lacked the opportunity to cross-examination [sic] Sophie or Faye. In fact, Sophie was thoroughly cross-examined during the first trial. Moreover, Faye testified during the first trial, and we assume that Aberha had the opportunity to cross-examine her, as he does not assert that he was denied this opportunity on appeal. Accordingly, we conclude that Aberha's cross-examination of Sophie, his opportunity to cross-examine Faye, and his ability to conduct discovery during the first trial adequately satisfied the Confrontation Clause requirements.

(ECF No. 26-15 at 3-7 (footnotes omitted)).

### 3. Analysis

Aberha argues that the Boldersons were not unavailable, because they could have attended the trial if they wanted to, they simply chose not to attend the trial. (ECF No. 12-15.) In effect, Aberha argues that the Boldersons did not make a good-faith effort to attend the trial, and, therefore, they were not unavailable. But Aberha has not cited to any Supreme Court precedent to support the theory that a witness cannot be found unavailable unless the *witness* makes a good-faith effort to appear at trial. Rather, the Supreme Court has held that the *prosecution* must make a good-faith effort to obtain the witness's presence before a witness can be deemed unavailable. *Barber*, 390 U.S. at 724-25.

The Nevada Supreme Court relied on *Mancusi v. Stubbs*, 408 U.S. 204 (1972) in concluding that the state court properly found that the Bolderson's were unavailable. In that case, a witness testified during an initial trial, but before a second trial was held, the witness had moved to Sweden. *Mancusi*, 408 at 208-09. The State issued a subpoena to the witness's last known United States address but was not able to effectuate service. (*Id.* at 9.) The State called the witness's son, and the son testified that his father had moved to Sweden. (*Id.*) The Supreme Court found that the witness was unavailable, noting that as far as the record showed, the State "was powerless to

1  compel his attendance at the second trial." *Id.* at 212. In *Mancusi*, it is not clear whether the
2  prosecution made any attempt to request that the witness attend, either directly or through his son.
3  *Id.* at 223 (Marshall, J. dissenting) (stating that at a minimum the prosecution could have notified
4  the witness that the trial was scheduled and invited him to come at his own expense).

5        As the Nevada Supreme Court noted, in this case the prosecution communicated the trial
6  date to Sophie and received a response indicating that Sophie did not want any further delays. A
7  few weeks before the trial, the prosecution sent an email to Sophie informing her that the trial was
8  going forward as scheduled. Sophie then indicated that she and her sister would not come to the
9  trial. At that point, the prosecution issued a subpoena to Sophie and filed a motion to continue.

10       Aberha argues that there is a process to subpoena a witness from the United Kingdom, but
11 he concedes that by the time that the prosecution learned that the Boldersons would not attend the
12 trial, it was too late to complete the subpoena process before the trial date. (ECF No. 33 at 15.) As
13 such, it is undisputed that the prosecution was powerless to compel the Boldersons' attendance at
14 that point, unless the trial was continued. Aberha argues that the prosecution could have gone
15 through the process to subpoena the Boldersons as soon as the second trial date was set and that
16 the prosecution's failure to do so means that the prosecution did not make a reasonable effort to
17 obtain the Boldersons' presence. (*Id.* at 18.) But Aberha does not cite to any authority to support
18 that the prosecution must preemptively issue subpoenas to potential witnesses who have indicated
19 that they will voluntarily testify.

20       Based on this record, the Nevada Supreme Court's determination that the district court
21 properly found Sophie and Faye Bolderson unavailable and rejecting Ground 1 constituted an
22 objectively reasonable application of federal law and was not based on an unreasonable
23 determination of the facts. *Barber*, 390 U.S. at 722; *Mancusi*, 408 U.S. at 204. As such, Aberha is
24 not entitled to relief on Ground 1.

      **B. Ground 2**

26       In Ground 2, Aberha argues that the state court's decision to exclude certain evidence
27 violated his right to present his defense under the Fifth, Sixth, and Fourteenth Amendments. (ECF
28 No. 19 at 26.)

Prior to the first trial, Aberha sought to introduce evidence of charges for the room that the Boldersons and their friend Jess moved to after the incident at the Vdara Hotel. (ECF No. 24-43.) Specifically, Aberha sought to introduce evidence that there was a "romance kit" on the bill for the room. (*Id.* at 3.) Aberha argued that the purchase of a romance kit was relevant because it would be "the most unexpected purchase" following a sexual assault. (*Id.* at 5-6.) The state court refused to allow the evidence on the grounds that it was improper under Nevada's rape shield statutes and that "to the extent it's not a violation of these statutes, I don't see any relevant purpose of it." (ECF No. 24-26 at 123.)

Prior to the second trial, Aberha sought to introduce a hotel bill from the Boldersons' stay in Las Vegas during the first trial. (ECF No. 25-27 at 148-157.) The bill showed that while Sophie and Faye were in Las Vegas to testify during the first trial, alcoholic beverages had been charged to their room. (*Id.* at 147-48.) The prosecutor objected to the hotel bill based on its relevance and its probative value versus prejudice. (*Id.* at 147.) The state court sustained the objection and excluded the bill on the grounds that the probative value was substantially outweighed by the danger of unfair prejudice. (*Id.* at 157.)

### 1. Relevant law

The United States Supreme Court has recognized that a defendant possesses "'a meaningful opportunity to present a complete defense.'" *Nevada v. Jackson*, 569 U.S. 505, 509 (2013) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)). States possess "'broad latitude under the Constitution to establish rules excluding evidence from criminal trials.'" *Id.* (quoting *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006)). The Supreme Court has explained "that 'trial judges retain wide latitude' to limit reasonably a criminal defendant's right to cross-examine a witness 'based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" *Michigan v. Lucas*, 500 U.S. 145, 149 (1991) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).

### 2. State court determination

In denying Aberha's direct appeal, the Nevada Supreme Court wrote:

Aberha argues that the district court erred by precluding admission of an Aria Hotel & Casino hotel bill, where Sophie and Faye stayed following Sophie's sexual assault examination, and the Golden Nugget Hotel & Casino hotel bill, where Sophie and Faye stayed while attending the first trial three years after the assault. We address each bill in turn.

Aberha argues the district court should have admitted the Aria hotel bill containing an itemization for a "romance kit" because it supports his theory of consent. The district court precluded admission of the Aria hotel bill as irrelevant to the issue of consent under Nevada's rape shield laws. Nevada's primary rape shield statute, NRS 50.090, provides that "[i]n any prosecution for sexual assault ... the accused may not present evidence of any previous sexual conduct of the victim of the crime to challenge the victim's credibility as a witness ...." However, NRS 48.069 creates a narrow exception to this statute and outlines the procedure a defendant must utilize if he or she wishes to present evidence of the victim's prior sexual conduct to prove consent. NRS 48.069. In order to present such evidence, the statute provides that: (1) the defendant must submit a written offer of proof and a sworn statement with the facts he expects to prove and their relevance; (2) if the district court finds the offer of proof sufficient, it must hold a hearing outside the presence of the jury and allow questions of the victim; and (3) if the court concludes the offered evidence is relevant to consent and admissible under NRS 48.035, then the evidence may be introduced. NRS 48.069.

Aberha submitted an offer of proof for the Aria hotel bill approximately one month before trial. Because the victim, Sophie, lived in England, the district court noted that it would have to hold the hearing on this motion on the first day of trial. At the hearing, the district court noted, "the purchase of the kit isn't sexual conduct, per se." We conclude the district court's initial analysis was correct in that the purchase of a romance kit is not "sexual conduct" under NRS 50.090. However, as further noted by the district court, and likely defense counsel's reasoning for providing an offer of proof and arguing for admission of the bill under rape shield statutes, the point of bringing [the bill] in and the potential relevance of it in this case, is that the kit shows she either had sex using condoms ... so the whole point is to imply that she's having sex with someone two days after or wants to have sex with someone two days after. And that shows she is lying about having been raped two days earlier and/or consented to have sex with the defendant because she was interested in having consensual sex with someone two days later.

Thus, despite finding that the Aria hotel bill was not evidence of "sexual conduct," the district court recognized that Aberha's purpose for seeking admission of the bill was to challenge Sophie's credibility as a witness in a manner prohibited by NRS 50.090. The district court further found that the Aria hotel bill was not relevant to the issue of consent and its admission was not permitted under NRS 50.090 and NRS 48.069. The district court therefore precluded admission of the bill. Using the district court's analysis, we conclude the district court was correct in finding that the purchase of a "romance kit" the day after the sexual assault occurred is irrelevant to show that Sophie somehow consented to sexual intercourse with Aberha a day earlier.

12

Moreover, even if the hotel bill does not constitute evidence of "sexual conduct" under NRS 50.090, we further conclude the hotel bill is inadmissible under NRS 48.035. *See Wyatt v. State*, 86 Nev. 294, 298, 468 P.2d 338, 341 (1970) ("If a judgment or order of a trial court reaches the right result, although it is based on an incorrect ground, the judgment or order will be affirmed on appeal."). Under NRS 48.035, a district court may exclude even relevant evidence if "its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues or of misleading the jury." Because "NRS 48.035 strongly favors admissibility ... [t]o merit exclusion, the evidence must unfairly prejudice an opponent, typically by appealing to the emotional and sympathetic tendencies of a jury, rather than the jury's intellectual ability to evaluate evidence." *Krause Inc. v. Little*, 117 Nev. 929, 935, 34 P.3d 566, 570 (2001) (internal citations and quotations omitted). Here, the bill's probative value is substantially outweighed by the danger of unfair prejudice and confusing or misleading the jury, and therefore the bill should not be admitted under NRS 48.035 for three reasons. First, both Sophie and Faye stayed in the Aria hotel room. Thus, either woman could have purchased the kit and admission of the bill had the potential to confuse and/or mislead the jury as to who purchased the kit. Second, the romance kit was purchased the day after the sexual assault, not immediately before the incident occurred. Thus, the purchase provides little probative value to show that Sophie allegedly consented to sexual intercourse the previous day. Third, to the extent the purchase of the romance kit evidences Sophie's cavalier attitude toward sex, or demonstrates promiscuity, such evidence is unduly prejudicial and contravenes the intended purpose of rape shield laws. *Summitt v. State*, 101 Nev. 159, 161, 697 P.2d 1374, 1375 (1985) (noting that a "purpose of such statutes is to protect rape victims from degrading and embarrassing disclosure of intimate details about their private lives" (internal quotation omitted)). Thus, the district court properly excluded the Aria hotel bill.

Aberha next claims that the district court erred by precluding the admission of the Golden Nugget hotel bill, where Sophie and Faye stayed when they attended the first trial three years after the assault. The hotel bill included charges for room upgrades and alcohol, which Aberha argues are relevant to determining whether Sophie's earlier actions at the Vdara hotel were consistent with consent rather than sexual assault. The State objected on relevance grounds and the district court precluded admission of the bill.

As previously noted, a district court may exclude even relevant evidence if "its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues or of misleading the jury." NRS 48.035. Similar to the Aria bill, the Golden Nugget bill had the potential to confuse the jury and unfairly prejudice Sophie because Sophie and Faye again shared a room at the Golden Nugget and either woman could have made the purchases. *See* NRS 48.035. Moreover, this bill is even less relevant than the bill from the Aria, because it concerns purchases made three years after the sexual assault. As such, Aberha's argument that the Golden Nugget bill could have established that Sophie consented to have sex with him three years earlier lacks merit. Furthermore, any other probative purpose the bill might serve, such as evidence of Sophie's attitude toward

sex or to argue she failed to act like a rape victim, is substantially outweighed by the risk of unfair prejudice. NRS 48.035. We therefore conclude the district court properly excluded the Golden Nugget hotel bill.

### 3. Standard of Review

Aberha argues that Ground 2 should be reviewed *de novo* because the Nevada Supreme Court did not specifically address whether the state court's evidentiary rulings violated Aberha's constitutional rights. (ECF No. 23-24.) Rather, the Nevada Supreme Court's order focused on whether the state court's rulings excluding evidence comported with Nevada's evidentiary rulings. (ECF No. 26-15 at 8-12.) Aberha argues that this means that the Nevada Supreme Court did not address his claim that the exclusion of the evidence violated his constitutional rights. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 99-100.

Aberha argues that the *Richter* presumption does not apply in this case because the Nevada Supreme Court's order addressed state evidentiary rules, rather than his constitutional claim, showing that the Nevada Supreme Court did not adjudicate his constitutional claims on the merits. The Court disagrees. The fact that the Nevada Supreme Court order did not specifically discuss constitutional issues does mean that it did not consider Aberha's constitutional claims on the merits. Aberha fails to rebut the presumption that the Nevada Supreme Court considered the federal claim. Pursuant to *Richter*, the Court presumes that the Nevada Supreme Court adjudicated Aberha's constitutional claims on the merits.

### 4. Analysis

The Nevada Supreme Court reasonably determined that the romance kit and the Golden Nugget Bill were properly excluded under Nevada evidentiary rules because the probative value of each piece of evidence was substantially outweighed by risk of unfair prejudice. Having so determined, the Nevada Supreme Court could have reasonably concluded that excluding the evidence did not violate Aberha's constitutional rights. *See Holmes*, 547 U.S. at 324 ("While the

1  Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate
2  purpose or that are disproportionate to the ends that they are asserted to promote, well-established
3  rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by
4  certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the
5  jury.")

6  In Aberha's reply, he argues that although states have broad latitude to establish rules
7  excluding certain evidence, that latitude is not absolute. (ECF No. 33 at 22.) Aberha cites to several
8  examples where the Supreme Court found evidentiary rules to be unconstitutional. (*Id.* at 22-23.)
9  But none of the examples that Aberha cites to deal with weighing the probative value of evidence
10 against its potential for prejudice.

11 In *Robertson v. Pichon*, the Ninth Circuit noted that the Supreme Court has never addressed
12 the question of whether a rule of evidence that requires balancing probative value against prejudice
13 could violate a defendant's constitutional rights. *Robertson v. Pichon*, 849 F.3d 1173, 1189 (9th
14 Cir. 2017). In that case, a petitioner argued that he was denied the opportunity to present a complete
15 defense when the trial court excluded certain evidence after finding that the probative value of the
16 evidence was substantially outweighed by the undue consumption of time. *Id.* The Ninth Circuit
17 held that because there was no Supreme Court decision establishing that such an evidentiary rule
18 could violate the petitioner's constitutional rights, no reasonable jurist could disagree with the
19 conclusion that the state court's rejection of evidence was not contrary to, or an unreasonable
20 application of, clearly established federal law. (*Id.*)

21 On this record, the Nevada Supreme Court's decision rejecting Ground 2 was neither
22 contrary to, nor an unreasonable application of, federal law. Aberha is not entitled to relief on
23 Ground 2.

24         **C. Ground 3**

25 In Ground 3, Aberha claims that there was insufficient evidence to support his convictions,
26 violating his right to due process under the Fifth and Fourteenth Amendments.

27         **1. Relevant law**

28 When a habeas petitioner challenges the sufficiency of evidence to support his conviction,

the court reviews the record to determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Jones v. Wood*, 207 F.3d 557, 563 (9th Cir. 2000).

Sufficiency claims are limited to a review of the record evidence submitted at trial. *Herrera v. Collins*, 506 U.S. 390, 402 (1993). Such claims are judged by the elements defined by state law. *Jackson*, 443 U.S. at 324, n.16). The reviewing court must respect the exclusive province of the fact-finder to determine the credibility of witnesses, to resolve evidentiary conflicts, and to draw reasonable inferences from proven facts. *United States v. Hubbard*, 96 F.3d 1223, 1226 (9th Cir. 1996). The district court must assume the trier of fact resolved any evidentiary conflicts in favor of the prosecution, even if the determination does not appear on the record and must defer to that resolution. *Jackson*, 443 U.S. at 326.

Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt is habeas relief warranted. *Jackson*, 443 U.S. at 324. When the deferential standards of AEDPA and *Jackson* are applied together, the question for decision on federal habeas review is whether the state court's decision unreasonably applied the *Jackson* standard to the evidence at trial. *See, e.g., Juan H. v. Allen*, 408 F.3d 1262, 1274–75 (9th Cir. 2005) (citations omitted).

### 2. State court determination

In denying Aberha's direct appeal, the Nevada Supreme Court wrote:

> Aberha also contends there was insufficient evidence to sustain his convictions. On appeal, this court determines whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Grey v. State*, 124 Nev. 110, 121, 178 P.3d 154, 162 (2008) (emphasis in original) (internal quotation omitted). The testimony of a victim, alone, is sufficient to meet the beyond a reasonable doubt standard. *State v. Gomes*, 112 Nev. 1473, 1481, 930 P.2d 701, 706 (1996). Thus, while we conclude Sophie's testimony alone was sufficient to uphold Aberha's convictions, we note that her testimony was corroborated by Rodarte's testimony and DNA evidence. Accordingly, there was sufficient evidence to uphold the convictions.

(ECF No. 26-15 at 12 n. 3.)

### 3. Analysis

Under Nevada law, a person is guilty of residential burglary if the person unlawfully enters or remains in a dwelling "with the intent to commit grand or petit larceny, assault or battery on any person or any felony." NRS 205.060. A person is guilty of sexual assault if the person "[s]ubjects another person to sexual penetration . . . against the will of the victim or under conditions in which the perpetrator knows or should know that the victim is mentally or physically incapable of resisting or understanding the nature of the perpetrator's conduct." NRS. 200.366.

Aberha argues in reply that the only witness to definitively claim that there was a sexual assault, as opposed to a consensual sexual encounter, was Sophie, and that there were reasons to doubt her testimony. (ECF No. 33 at 31.) Aberha does not appear to challenge the sufficiency of the evidence to support any element of his sexual assault conviction other than consent. Aberha does not articulate any specific challenge to the sufficiency of the evidence to support his burglary conviction. But, to the extent that Sophie invited Aberha to her room and engaged in a consensual sexual encounter with him, Aberha would not have entered her room unlawfully with the intent to commit a crime. Aberha's only challenge to the sufficiency of the evidence is based on whether the evidence was sufficient to support that Sophie did not consent to the sexual encounter.

Aberha argues that Sophie's testimony was not credible because: Sophie got ready for bed despite knowing that a hotel employee would be coming to the room to make up the sofa bed; detective Fink testified that when initially questioned about the incident Rodarte stated that Sophie was conscious and "going with it;" the sexual assault nurse could not say whether a sexual assault had occurred; and Sophie sued the casino over the incident and came to a settlement. (ECF No. 33 at 29-31.)

Aberha's argument amounts to an argument that the jury should not have believed Sophie. But the Nevada Supreme Court was not required to independently assess whether the jury should have believed Sophie. Rather, as the Nevada Supreme Court reasonably stated when considering Aberha's sufficiency of the evidence claim, a court must view the evidence in the light most favorable to the prosecution. The Nevada Supreme Court noted several pieces of evidence that could allow a rational trier to find Aberha guilty beyond a reasonable doubt.

Based on this record, the Nevada Supreme Court's determination that there was sufficient evidence to support Aberha's conviction constituted an objectively reasonable application of federal law and was not based on an unreasonable determination of the facts. *Jackson*, 443 U.S. at 324. As such, Aberha is not entitled to relief on Ground 3.

## V.   CERTIFICATE OF APPEALABILITY

This is a final order adverse to Aberha. Rule 11 of the Rules Governing Section 2254 Cases requires the Court to issue or deny a certificate of appealability ("COA"). Therefore, the Court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002). Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

Applying these standards, this Court finds that a certificate of appealability is unwarranted.

## VI.   CONCLUSION

It is therefore ordered that Petitioner Ashenafi Gerre Aberha's Amended Petition for Writ of Habeas Corpus (ECF No. 19) is denied.

Petitioner's request for an evidentiary hearing (ECF No. 19) is denied.

It is further ordered that a certificate of appealability is denied.

The Clerk of the Court is directed to substitute Brian Williams for Respondent William Gittere, enter judgment accordingly, and close this case.

DATED this 31st day of January, 2023.

LARRY R. HICKS
UNITED STATES DISTRICT JUDGE